******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# JOHN C. RETTMAN *v.* MAURA L. RETTMAN
## (AC 46429)

Moll, Clark and Wilson, Js.

*Syllabus*

The defendant, whose marriage to the plaintiff had previously been dissolved, appealed from, inter alia, the trial court's judgment denying her motion to open the judgment denying her motions to open the dissolution judgment with respect to financial orders. She claimed, inter alia, that the court abused its discretion in denying her motion to open because the court had abused its discretion in denying the motions to open the dissolution judgment after depriving her of her right to complete the hearing on those motions that had begun before a different trial court judge and was never concluded. *Held*:

This court concluded, on the basis of the unique circumstances presented, including the unusual procedural history of the case, that the trial court abused its discretion in denying the motion to open the judgment denying the motions to open the dissolution judgment, as the hearing held on the defendant's motions to open the dissolution judgment on the basis of fraud did not conclude because the trial judge conducting the hearing was later reassigned and, despite the defendant's efforts to comply with that judge's orders to take steps to ensure that the hearing would conclude at a later date at which the defendant would be able to present evidence and be heard with respect to the merits of her motions to open, the hearing never resumed, and a different trial judge thereafter denied the motions to open, without an evidentiary hearing, on the basis of facts that were not in evidence.

Contrary to the plaintiff's claim, this court did not lack subject matter jurisdiction over the defendant's claim that the trial court abused its discretion in denying her motion for contempt because there was practical relief that this court could afford to the defendant in connection with that claim, and, thus, this court was not persuaded that this portion of the appeal should be dismissed on mootness grounds.

The trial court did not abuse its discretion in denying the defendant's motion for contempt with respect to the plaintiff's failure to comply with his obligation to pay alimony, as the court reasonably concluded, in light of the totality of the circumstances, that the plaintiff's conduct was not wilful and reasonably declined to impose the harsh penalty of contempt in favor of requiring the plaintiff to pay the unpaid portion of his alimony obligation.

The trial court did not abuse its discretion in denying the defendant's motion for contempt with respect to the plaintiff's failure to timely comply with the court's order that he quitclaim the marital home to the defendant, as the order was unclear and ambiguous and the court properly considered

the plaintiff's rationale for his alleged noncompliance, which supported the court's finding that the plaintiff's failure was not wilful.

Argued March 19—officially released August 5, 2025

*Procedural History*

Action for the dissolution of a marriage, and for other relief, brought to the Superior Court in the judicial district of New Haven at Meriden, where the court, *Maureen M. Murphy, J.*, rendered judgment dissolving the marriage and granting certain other relief; thereafter, the court, *Price-Boreland, J.*, denied the defendant's motions to open the judgment; subsequently, the court, *Price-Boreland, J.*, denied the plaintiff's motion to open the judgment denying the motions to open, and the defendant appealed to this court; thereafter, the court, *Price-Boreland, J.*, denied the defendant's motion for contempt, and the plaintiff filed an amended appeal. *Reversed in part*; *vacated*; *further proceedings*.

*Jeffrey D. Brownstein*, for the appellant (defendant).

*John C. Rettman*, self-represented, the appellee (plaintiff).

*Opinion*

WILSON, J. In this marital dissolution action, the defendant, Maura L. Rettman, brings this amended appeal from the judgment of the trial court denying her motion to open the court's denial of several motions to open the financial orders entered at the time of its final decree. The defendant also appeals from the judgment of the trial court denying her motion for contempt that was based on the alleged noncompliance of the plaintiff, John C. Rettman,[1] with the financial orders. The defendant claims that the court abused its discretion in denying (1) the motion to open, (2) the motion

---

[1] The plaintiff is a self-represented party before this court and, at times, appeared as a self-represented party during the relevant proceedings before the trial court.

for contempt insofar as it was based on (a) the plaintiff's failure to comply with his obligation to pay alimony, and (b) the plaintiff's failure to timely comply with the court's order that he quitclaim the marital home to her. We reverse the judgment denying the motion to open and remand the case to the trial court for further proceedings. We affirm the judgment denying the motion for contempt.

It is useful to set forth at the outset of this opinion the following procedural history relevant to the claims raised on appeal. On February 5, 2013, the court, *Maureen M. Murphy, J.*, rendered a judgment dissolving the parties' marriage and incorporating into its judgment the terms of the parties' written dissolution agreement, with some modifications made directly by the court. Pursuant to the terms of the judgment, the plaintiff was required, among other things, (1) to make alimony payments of $600 per month to the defendant for two years, and (2) to "quitclaim [the marital home] to the defendant."

Thereafter, the defendant filed several motions to open the judgment based on the plaintiff's alleged failure, during the dissolution proceeding, to disclose on his financial affidavit the existence of his military pension. On October 5, 2022, the court, *Price-Boreland, J.*, denied three such motions on the ground that they were untimely. On March 8, 2023, the defendant filed a motion to open the judgment denying her motions to open, which Judge Price-Boreland denied on that same day. Thereafter, the defendant appealed from Judge Price-Boreland's March 8, 2023 ruling.

On December 14, 2022, before the court had finally disposed of the defendant's motions to open the dissolution judgment, the defendant filed a motion for contempt in which she alleged that the plaintiff had violated the court's financial orders by failing to pay alimony

from February, 2013, until February, 2015; failing to timely comply with the order that he quitclaim the marital home to her; and failing to pay certain household bills. On May 30, 2024, following an evidentiary hearing, Judge Price-Boreland denied the motion for contempt. Thereafter, the defendant amended her existing appeal to include the judgment rendered on the motion for contempt. Additional facts and procedural history will be set forth as necessary.

I

First, we address the defendant's claim that the court abused its discretion in denying her motion to open. We agree with the defendant.

The following additional procedural history is relevant to this claim. On June 30, 2016, September 9, 2019, February 28, 2020, and July 26, 2021, the defendant filed motions to open the judgment.[2] On August 17, 2021, the parties appeared remotely before the court, *Tindill, J.*, who was then sitting at the Superior Court in Meriden, for a hearing that addressed pending matters before the court, including the defendant's outstanding motions to open. The defendant was represented by an attorney, but the plaintiff appeared as a self-represented litigant. At the beginning of the hearing, the plaintiff stated that the attorney he intended to represent him had recently returned from a deployment and the attorney intended to file an appearance on his behalf, but he was unable to do so because he had contracted COVID-19. The plaintiff stated, however, that he wished to proceed that day as a self-represented litigant because he desired to put this case to rest.

Thereafter, the defendant presented evidence in support of the motions to open, which included her own

---

[2] On July 16, 2021, the court, *Tindill, J.*, dismissed the motion to open that was filed on September 9, 2019. That ruling is not at issue in this appeal.

testimony. After the defendant's attorney concluded his direct examination of the defendant, the plaintiff stated that he "would like to postpone [the hearing] until I get my lawyer involved and he files his appearance." The defendant's attorney responded by reminding the court that, at the beginning of the hearing, the plaintiff stated that he wished to proceed without the assistance of an attorney. Judge Tindill asked the plaintiff when his attorney would be able to file an appearance on his behalf. The plaintiff replied that he believed that could occur "by the end of the week . . . ." Judge Tindill notified the parties that, as of September 7, 2021, she would be assigned to another judicial district and would be sitting at the Superior Court in Milford. Judge Tindill stated that her reassignment would require the caseflow coordinator at the Superior Court in Meriden to coordinate scheduling the matter with the caseflow coordinator at the Superior Court in Milford. The proceeding then was adjourned.

Consistent with what transpired at the hearing, on August 17, 2021, Judge Tindill issued an order stating: "A remote hearing was held on August 17, 2021, regarding the defendant's motions to open judgment . . . and the plaintiff's objection . . . . The plaintiff appeared pro se; the defendant appeared with counsel.

"The plaintiff testified that his attorney has returned from his deployment in Jordan, but was ill with COVID-19. The plaintiff expects his counsel to file an appearance on his behalf when he is well and no longer in quarantine. The plaintiff indicated that he wanted to proceed with the hearing in his counsel's absence since there has been such a delay in the postjudgment proceedings.

"Both parties testified. The defendant submitted eight exhibits into evidence and the court took judicial notice of its July 16, 2021 order . . . the parties' February 5,

2013 financial affidavits . . . and the judgment file
. . . and the transcript of the divorce proceedings
. . . .

"The hearing did not conclude. The plaintiff indicated
that he did not wish to continue without the assistance
of his attorney with whom he expected to be able to
communicate this week. The plaintiff completed cross-
examination of the defendant's direct testimony; coun-
sel for the defendant indicated [that] he had additional
questions on redirect examination." Judge Tindill ordered
the plaintiff to have his attorney file an appearance as
soon as was practicable and ordered the parties to
arrange with the court caseflow clerk to schedule a
hearing date to complete the hearing on the motions
to open.

The record reflects that, following the hearing, the
defendant made several attempts to schedule a hearing
date to complete the hearing on the motions to open.
For example, on October 24, 2021, the defendant filed
a caseflow request for that purpose, noting that the
matter needed to be scheduled as soon as possible. On
October 28, 2021, Judge Tindill denied the request. On
May 23, 2022, the defendant requested a status confer-
ence and a date to resume the hearing that had begun
before Judge Tindill. The court, however, did not act
on this request. Attached to the request were emails to
show correspondence between the defendant's attor-
ney and the attorney who was then representing the
plaintiff, in which the defendant's attorney discussed
his attempts to have the matter heard. Attached to the
request was also a copy of an email, dated September 12,
2021, that the defendant's attorney sent to the caseflow
coordinator at the Superior Court in Meriden in an
attempt to schedule a date on which the hearing could
resume. The email shows that the caseflow coordinator
at that court had instructed the defendant's attorney
simply to await contact from the caseflow coordinator

at the Superior Court in Milford. Attached to the request was also a copy of a fax, dated November 19, 2021, sent by the defendant's attorney to the caseflow coordinator at the Superior Court in Milford, seeking the continuation of the hearing before Judge Tindill. In the motion, counsel noted that "[t]here is nothing more I can [possibly] do" to have the matter heard and avoid a judgment of dismissal.

Eventually, a hearing on the outstanding motions was scheduled in the Superior Court in Meriden for September 22, 2022. The parties appeared before the court, *Price-Boreland*, *J.*, on that date. At the hearing, the defendant was represented by an attorney and the plaintiff appeared in a self-represented capacity.

From the onset of the proceeding, there was confusion between the court and the parties as to whether the defendant's motions to open were properly before the court for consideration. Specifically, Judge Price-Boreland questioned whether Judge Tindill had declared a mistrial with respect to the motions to open, whether the parties were before the court to "complete the . . . hearing on the [motions] to open," or whether the parties were before the court to "start" a new hearing on the motions.[3] The court expressed its belief that, if the motions to open were properly before it, it could not resume the hearing that began on August 17, 2021, but that it would need to conduct a new hearing. The defendant's attorney emphatically represented that he had

---

[3] At one point during the court's colloquy with the defendant's attorney, the defendant's attorney referred to a "note" in the file indicating that Judge Tindill had declared a mistrial with respect to a motion for contempt. He stated that he was concerned that this note might lead to "confusion" about what had been disposed of by Judge Tindill. The record reflects that, on November 3, 2021, Judge Tindill declared a mistrial with respect to a motion for contempt that the defendant filed on September 9, 2019. The defendant's counsel further represented to the court that Judge Tindill's November 3, 2021 ruling only pertained to the September 9, 2019 contempt motion and did not pertain to any of the pending motions to open the judgment of dissolution.

not received notice that Judge Tindill had declared a mistrial with respect to the motions to open and that the matter had merely been continued at the request of the plaintiff. After a lengthy discussion with the parties, Judge Price-Boreland stated that it was necessary that she receive additional information directly from Judge Tindill. The court stated that "[w]e need to put some closure on how this file's being handled for the court to even step in and move forward." The court further stated: "There are too many moving parts and too many unanswered questions. And I think the best person to probably give us what we need is Judge Tindill." Judge Price-Boreland stated that, in the interest of not leaving the motions to open unresolved, she would dismiss the motions with prejudice "subject to [Judge Tindill's] decision" as to whether Judge Tindill had afforded the parties an expectation that their hearing would continue before Judge Tindill.

On September 23, 2022, Judge Price-Boreland issued an order stating: "A hearing was held on September [22], 2022,[4] regarding all pending motions before the court . . . . The court refers the matter to Judge Erika Tindill for review, subject to continuing of hearing the matters that were previously before Her Honor. The court enters separate orders on the motions to open judgment."

By order dated October 3, 2022, Judge Price-Boreland denied the defendant's motions to open as untimely.[5] The court stated: "The defendant has filed four motions to open in this dissolution [action], which went to judgment on February 5, 2013, by stipulation. The first motion was filed on June 30, 2016 . . . but was not

---

[4] The court, in its order, referred to a hearing date of September 23, 2022, but we consider this to be a scrivener's error as the record unequivocally reflects that the hearing occurred on September 22, 2022.

[5] We note that, although the court's order is dated October 3, 2022, the record reflects that it was filed on October 5, 2022.

pursued due to alleged issues with serving the plaintiff while he was residing in Turkey. This motion alleged that the plaintiff committed fraud by failing to disclose his vested military retirement on the financial affidavit he submitted at the time of dissolution.

"Over three years later, subsequent motions to open were filed on September 9, 2019 . . . February 28, 2020 . . . and July 26, 2021 . . . . All three of these motions are exactly the same, with the exception of a different heading date. These motions also relate to the plaintiff's alleged failure to disclose his military pension to the court on his financial affidavit at the time of judgment.

"After careful consideration of the relevant pleadings, case law, and statutory authority, the court denies the motions to open . . . for failure to comply with the requirements of General Statutes § 52-212 and Practice Book § 17-43 relating to timeliness of bringing a claim.

"Public policy favors the finality of judgments. *LaPenta* v. *Bank One, N.A.*, 101 Conn. App. 730, 763 n.3, [924 A.2d 868], cert. denied, 284 Conn. 905, [931 A.2d 264] (2007). More specifically, '[our courts] have strongly disfavored [collateral] attacks upon judgments because such belated litigation undermines the important principle of finality. . . . The law aims to invest judicial transactions with the utmost permanency consistent with justice. . . . Public policy requires that a term be put to litigation and that judgments, as solemn records upon which valuable rights rest, should not lightly be disturbed or overthrown.' [(Citations omitted; internal quotation marks omitted.)] *Meinket* v. *Levinson*, 193 Conn. 110, 113, 474 A.2d 454 (1984). In addition, it is well cited that the court has an inherent authority to manage its docket as it sees fit.

"In the instant action, the defendant was aware of and/or was of the belief that the plaintiff had a military pension at the time of the dissolution and was also

aware that the plaintiff was not disclosing this pension on his financial affidavit . . . . The defendant did not file a motion to open regarding the plaintiff's alleged failure to disclose these assets until three years later, in 2016. That motion was not prosecuted, and the defendant states that this was because she was unable to effectuate service on the plaintiff while he was living in Turkey . . . . To the court's knowledge, no additional steps were taken to attempt to effectuate or remedy the issue of service of this motion. Indeed, the defendant did not refile her motion to open for the same issue until over three years later, in 2019.

"The court does not find that the defendant diligently attempted to serve her 2016 motion to open because it has no objective evidence showing that she attempted to remedy the issue of effectuating marshal service on the plaintiff in Turkey. Even if the court accepted the [defendant's] claim that she was unable to serve the [plaintiff] until he returned to the United States in December of 2018, the [defendant] was still remiss in diligently prosecuting her claim in that she did not file her subsequent motions to open until over nine months later . . . .

"In light of the aforementioned, the court finds that the defendant does not have good cause for the delay in prosecuting her claim. More specifically, the court does not find that the defendant was prevented by mistake, accident or other reasonable cause from prosecuting her action or making her defense. The amount of time that elapsed between the defendant's filings is not timely and is contrary to the public policy that upholds the importance of maintaining the integrity of the finality of judgments." (Citations omitted; footnote added.)

On October 5, 2022, Judge Tindill issued an order stating: "A hearing was held on August 17, 2021, regarding the defendant's motions to open judgment . . . and

the plaintiff's objection . . . . The hearing did not conclude on those motions on that day. No further hearing was held on these motions until [thirteen] months later, at which time the judge that was overseeing the proceedings was no longer assigned to the [Superior Court in] Meriden [in the] judicial district [of New Haven].

"In light of the aforementioned, the court hereby declares a mistrial regarding the above motions."

On October 24, 2022, the defendant filed a motion to reargue Judge Price-Boreland's order of October 3, 2022. The defendant argued, in part, that Judge Price-Boreland was mistaken about the fact that Judge Tindill had declared a mistrial with respect to the pending motions to open. In this regard, the defendant relied on what transpired at the unfinished hearing before Judge Tindill on August 17, 2021, as well as her attorney's ensuing correspondence with the caseflow coordinator at the Superior Court in Meriden. The defendant also challenged the court's finding that the defendant had not pursued the motions to open with due diligence.

On November 9, 2022, Judge Price-Boreland issued an order denying the defendant's motion to reargue the court's denial of the motions to open. The court stated in its order that it "clarifies one of the misstatements within the motion claiming that a mistrial has not been declared by Judge Tindill on the motion to open." In its order, the court specifically referred to Judge Tindill's order of October 5, 2022.

On March 8, 2023, the defendant filed a motion to open the judgment denying her motions to open. Among the myriad grounds and arguments set forth in the motion, the defendant asserted that it was improper for Judge Price-Boreland to have relied on the fact that Judge Tindill had declared a mistrial with respect to her motions to open because the defendant lacked notice of that ruling until she received Judge Tindill's order

of October 5, 2022, which occurred well after the hearing that took place before Judge Price-Boreland on September 22, 2022. The defendant argued that she was not afforded an opportunity to be heard with respect to Judge Tindill's ruling. She also argued that the ruling plainly contradicted the terms of Judge Tindill's order of August 17, 2021, which directed the parties to have the matter scheduled for purposes of completing the hearing on the motions to open. Moreover, the defendant argued that, among other attempts made by her to have the motions to open heard, she had filed caseflow requests for a new hearing date following the August 17, 2021 unfinished hearing, which undermined Judge Price-Boreland's observation that she had not diligently pursued the motions for thirteen months following the uncompleted hearing in August, 2021. According to the defendant, she believed that the hearing that was scheduled before Judge Price-Boreland on September 22, 2022, was to be a continuation of the hearing that had occurred on August 17, 2021. The defendant argued that she was prepared to continue the hearing either before Judge Tindill or before Judge Price-Boreland and that it was unreasonable for Judge Price-Boreland to expect that the parties would begin the hearing anew when they appeared before her on September 22, 2022. The defendant also argued that the court's reliance on § 52-212 and Practice Book § 17-43 was erroneous in light of the fact that she had not failed to appear and had not been either defaulted or nonsuited. The defendant argued that "there was no basis for a mistrial in this matter and certainly no basis for a dismissal of the action." On March 8, 2023, the same day on which the motion was filed, Judge Price-Boreland denied the motion to open the October 3, 2022 judgment.

Thereafter, the defendant filed a motion for articulation of the March 8, 2023 ruling. On April 4, 2023, Judge Price-Boreland set forth the following articulation: "A

judgment rendered may be opened after four months if it is shown that the judgment was obtained by fraud, in the absence of actual consent, or because of mutual mistake.

"The parties' marriage was dissolved on February 5, 2013, pursuant to an agreement.

"This court has reviewed the pleadings in the file to include the transcript of hearings. The court takes judicial notice of all the relevant pleadings in the file. Of note, the court has reviewed the transcript of the dissolution hearing with Judge Maureen Murphy, dated February 5, 2013. The parties were divorced through an agreement.

"The initial agreement of the parties allowed for the plaintiff and the defendant to both retain the marital home as joint property for four years, with the payment of the expenses similar to what they had practiced for years. After four years, the property would be transferred by the plaintiff to the defendant and the defendant would assume all [of] the expenses of the property. Judge Murphy rejected the agreement as not being fair and equitable.

"Nonetheless, pursuant to the parties' subsequent request, the matter was recalled after the parties informed the court that they had a revised agreement and [were] ready to proceed. The matter was passed at 10:48 a.m. and recalled at 12:30 p.m. The agreement now allowed for the defendant to receive alimony of $600 per month for two years and that the plaintiff would also cover all the expenses for the property during the two years. The parties were both fully canvassed, and the agreement was approved, adopted by the court, and went to judgment.

"The court is limited in granting relief from a dissolution judgment secured by fraud if (1) [t]here are no

laches or unreasonable delay by the injured party after the fraud was discovered . . . (2) [t]here must be clear proof of fraud [and] . . . (3) [t]here is a substantial likelihood that the result of the new trial will be different.

"After an exhaustive review of the file, the transcripts on . . . file, and all the relevant pleadings within the file, the court found, pursuant to its order . . . dated October 3, 2022, that the defendant has filed the motion to open with undue delays, there is no clear proof of fraud as the defendant was aware at the time of dissolution of the plaintiff's military service, and there is no likelihood that a new trial will have a different result. The court's decision on the motion to open the judgment is final."

We begin by setting forth the legal principles that govern our review. "We do not undertake a plenary review of the merits of a decision of the trial court to grant or to deny a motion to open a judgment. . . . In an appeal from a denial of a motion to open a judgment, our review is limited to the issue of whether the trial court has acted unreasonably and in clear abuse of its discretion. . . . In determining whether the trial court abused its discretion, this court must make every reasonable presumption in favor of its action. . . . The manner in which [this] discretion is exercised will not be disturbed [as] long as the court could reasonably conclude as it did. . . .

"Pursuant to General Statutes § 52-212a, a civil judgment or decree rendered in the Superior Court may not be opened or set aside unless a motion to open or set aside is filed within four months following the date on which [the notice of judgment or decree was sent]. . . . An exception to the four month limitation applies, however, if a party can show, inter alia, that the judgment was obtained by fraud. . . .

"There are three limitations on a court's ability to grant relief from a dissolution judgment secured by fraud: (1) there must have been no laches or unreasonable delay by the injured party after the fraud was discovered; (2) there must be clear proof of the fraud; and (3) there [must be] a [reasonable probability] that the result of the new trial [would] be different." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Conroy* v. *Idlibi*, 343 Conn. 201, 204–205, 272 A.3d 1121 (2022).

Further, it is well established that "[a]ppellate review of a trial court's findings of fact is governed by the clearly erroneous standard of review. The trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . Therefore, to conclude that the trial court abused its discretion, we must find that the court either incorrectly applied the law or could not reasonably conclude as it did." (Internal quotation marks omitted.) *Ferraro* v. *Ferraro*, 168 Conn. App. 723, 727, 147 A.3d 188 (2016).

In her March 8, 2023 motion to open, the defendant argued that the court had abused its discretion because it denied the motions to open the dissolution judgment after depriving her of her right to complete the hearing that had begun before Judge Tindill in August, 2021, improperly relied on Judge Tindill's October 5, 2022 ruling declaring a mistrial with respect to the motions to open, and ultimately resolved material factual issues concerning the motions to open in the absence of any evidence. The defendant argued that she was denied due process and that the court's judgment could not

stand. The defendant reiterates these same arguments before this court in support of her challenge to the court's March 8, 2023 ruling denying the motion to open.[6]

It is undisputed that an evidentiary hearing related to the allegations of fraud set forth in the motions to open began at the trial held before Judge Tindill on August 17, 2021.[7] "When a court's exercise of discretion depends on disputed factual issues, such as the existence of fraud, due process requires an evidentiary hearing." *Davis* v. *Fracasso*, 59 Conn. App. 291, 299–300, 756 A.2d 325 (2000). Our careful review of the record reflects that, when the parties appeared before Judge Tindill on August 17, 2021, the court began to hear evidence in support of the defendant's motions to open the dissolution judgment on the basis of fraud. The hearing did not conclude. Judge Tindill, both at the hearing and in her written order of August 17, 2021, directed the parties to take steps to ensure that the hearing would conclude at a later date, after she had been reassigned to the Superior Court in Milford. The defendant did so by sending several caseflow requests and other correspondence to the court, to no avail.

---

[6] In articulating her arguments, the defendant invokes the bypass doctrine set forth in *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). The defendant's reliance on *Golding* is unnecessary because, in substance, she amply articulated before the trial court her belief that the denial of the motions to open in the absence of a completed hearing and in reliance on Judge Tindill's October 5, 2022 ruling deprived her of her right to due process. To the extent that the defendant's invocation of *Golding* is an attempt to raise a constitutional claim that is distinct from her claim that the court abused its discretion in denying her motion to open, it is unnecessary for us to resolve it because we conclude that the ruling reflected an abuse of discretion and should be reversed on that legal basis.

[7] Thus, this is not a case in which the court determined that the information included in the motions to open was insufficient to constitute the necessary threshold showing to entitle the defendant to an evidentiary hearing. Cf., e.g., *Wells Fargo Bank*, *N.A.* v. *Tarzia*, 186 Conn. App. 800, 809, 201 A.3d 511 (2019).

The record clearly reflects Judge Tindill's written order of August 17, 2021, in which she states that the hearing that began before her would continue. The record further reflects that, on September 22, 2022, the date of the proceeding before Judge Price-Boreland, no mistrial had been declared with respect to the motions to open. Indeed, Judge Tindill's ruling of October 5, 2022, reveals that she had not, prior to the date of her ruling, declared a mistrial. When the parties appeared before Judge Price-Boreland on September 22, 2022, however, the entirety of the proceeding was devoted to discussing what motions were properly before the court and, specifically, whether it was appropriate for the parties to be afforded an opportunity to conclude the hearing that began on August 17, 2021. When the proceeding was adjourned on September 22, 2022, Judge Price-Boreland made it clear that she would obtain more information from Judge Tindill. Judge Price-Boreland denied the motions on October 3, 2022, two days *before* notice was sent that Judge Tindill had declared a mistrial. On this record, we agree with the defendant that she not only lacked notice that Judge Tindill had declared a mistrial, but that Judge Tindill, in her ruling of August 17, 2021, expressly afforded her an expectation that she would be able to present evidence and be heard with respect to the merits of her motions to open.

Moreover, the defendant correctly argues that, in denying the motions to open, Judge Price-Boreland made factual findings despite the fact that the court did not hear any evidence related to the motions to open during the proceeding on September 22, 2022.[8] At

[8] We note that, at the outset of the proceeding, the parties were sworn in by the clerk, but the court and the parties thereafter discussed what matters were properly before the court, and neither party presented evidence with respect to the pending motions to open. Near the end of the proceeding, the court turned to a different topic by asking the parties about a pending motion for contempt that had been filed by the defendant. Specifically, the court briefly asked the parties questions about the plaintiff's history of

that proceeding, the court noted that, in order to reach the merits of the motions to open, it "would need to start an entire new . . . hearing" in light of the fact that it had "not been privy to the first day of the testimony" that took place before Judge Tindill. These comments make clear that Judge Price-Boreland did not have access to the evidence that the defendant presented at the uncompleted hearing before Judge Tindill, let alone that she had relied on it. Nonetheless, in ruling on the motions to open, Judge Price-Boreland, without an evidentiary hearing, specifically found that, at the time of the dissolution judgment, the defendant was aware of both the plaintiff's military pension and the fact that he was not disclosing its existence to the court. In addition, in her articulated decision of her March 8, 2023 denial of the motion to open the October 3, 2022 judgment denying the motions to open, the court once again, without having heard any evidence, stated that it had found "no clear proof of fraud . . . ." The court also found that, at the time of the dissolution judgment, "the defendant was aware . . . of the plaintiff's military service and there is no likelihood that a new trial will have a different result." It is well settled that a finding of fact that is not based on the evidence cannot withstand appellate scrutiny and, thus, a decision based entirely on such findings reflects an abuse of the court's discretion. See, e.g., *Ferraro* v. *Ferraro*, supra, 168 Conn. App. 727.

This case reflects an unusual procedural history. On the basis of the unique circumstances presented, we conclude that the denial of the defendant's March 8, 2023 motion to open the judgment denying the motions to open the judgment of dissolution was a clear abuse of the court's discretion. Accordingly, we conclude that

making alimony payments, to which they responded. We note, however, that hearings on the defendant's motion for contempt did not take place until September 7 and December 1, 2023, and March 1, 2024.

the proper remedy is to set aside the judgment denying that motion and remand the case for a new hearing on the defendant's motions to open the judgment of dissolution.

## II

Next, we address the defendant's claim that the court abused its discretion in denying the motion for contempt insofar as it was based on the plaintiff's failure (1) to comply with his obligation to pay alimony and (2) to quitclaim his rights to the marital home to her within the time specified in the judgment of dissolution. We are not persuaded by either subpart of this claim.

The following additional facts and procedural history are relevant to this claim. On December 14, 2022, before the court disposed of the defendant's motions to open the dissolution judgment, the defendant filed a motion for contempt in which she alleged that the plaintiff had violated the court's financial orders by failing to pay alimony from February, 2013, until February, 2015; to timely quitclaim his interest in the marital home to her; and to pay household expenses. The plaintiff filed a written objection to the motion. The court, *Price-Boreland, J.*, held a hearing on the motion for contempt on September 7 and December 1, 2023, and March 1, 2024. On May 30, 2024, the court rendered a judgment denying the motion for contempt. In its memorandum of decision, the court noted the relevant portions of the dissolution judgment rendered on February 5, 2013. First, the court noted that section 8 of the dissolution agreement provided that alimony would be paid to the defendant in the amount of $600 per month for two years. Next, the court noted that section 10 of the dissolution agreement provided that the parties' marital home in Meriden "will remain joint property of the plaintiff and the defendant for four years." Finally, the court noted that section 10 was modified by the court at the time of the dissolution

judgment to include the following language: "Sentence one shall be an order of the court. . . . [Sentence two of section 10 now states that the] plaintiff shall quitclaim this property to the defendant. The defendant shall be responsible for all household bills from the date of the [quitclaim] deed."

The court thereafter made findings with respect to the alleged instances of contempt. With respect to alimony, the court concluded that the order requiring the plaintiff to pay the defendant alimony in the amount of $600 per month for two years was clear and unambiguous. The court then made the following additional findings: "Pursuant to the parties' actions and relevant to the overall disposition of the issues before the court, the court finds it credible that, subsequent to the dissolution, the parties practiced a financial arrangement that was complicit and blurred the lines between the court orders and compliance with those court orders.

"The first notable incident was, despite the orders of the court, pursuant to the dissolution, requiring the plaintiff to quitclaim the property to the defendant in four years, the parties jointly refinanced the home in August of 2013, six months postdissolution. The refinancing provided for a reduction in the monthly mortgage payments to $660.

"The plaintiff's record on alimony paid to the defendant is found in his exhibits 1 and 6. Within those exhibits, the plaintiff summarized alimony payments made to the defendant. The summary reflects payments made from [his bank account] in the amount of $8174 from February, 2013, [through] May, 2018, labeled as alimony payments. The total alimony payments that should have been paid over the two years was $14,400, however, based on the evidence, the amount paid by the plaintiff was $8174, with no other direct evidence that the remaining $6226 was paid directly towards alimony.

The court finds this accounting credible. The court also takes judicial notice that the plaintiff never filed a motion for modification of alimony and so the [order] of the court at the time of dissolution stands.''

With respect to the allegation that the plaintiff failed to comply with his obligation to pay household bills, the court credited evidence that, during the relevant time period, the plaintiff had paid certain sewer expenses, real estate taxes, mortgage payments, cable expenses, gas expenses, and electric expenses. The court found that, between February, 2013, and November, 2020, the plaintiff paid $95,785 in household bills. The court acknowledged the defendant's claim that she had paid $32,000 in household expenses that should have been paid by the plaintiff but noted weaknesses in the evidence upon which the defendant relied to support this claim. Among the court's detailed findings, it also noted that "[t]here was testimony from both parties that each of them had their family members living in the [marital] home at various times, either consuming resources and not contributing or staying there to supplement the expenses of the home." In particular, the parties presented conflicting evidence with respect to an agreement, pursuant to which the plaintiff's sister allegedly lived at the home on the condition that she would assist the defendant with household bills. The court found "the merit and pertinent details of either parties' argument on this issue to be inconsequential within the larger context of the parties' ongoing complicit modification of the court orders.''

Finally, with respect to the allegation that the plaintiff failed to quitclaim his interest in the marital home to the defendant in a timely manner, the court stated: "The court takes judicial notice that the plaintiff filed a motion to compel sale of the property . . . [on] July 29, 2020. The motion was never ruled on by the court

and by that date he had already quitclaimed the property to the defendant.

"The plaintiff quitclaimed the property to the defendant on September 16, 2019, and recorded it on June 29, 2020 . . . . The court recognizes the quitclaim date of September 16, 2019, as the operative date of the plaintiff officially complying with the court orders. The original order of the court was not qualified with a date of recording, but a date to quitclaim. The court also finds it credible that, given the history of the parties' practice subsequent to the dissolution in meeting the financial obligations of the marital home, the timing of the quitclaim was perfunctory and, thus, the date that the quitclaim was recorded is not significantly distinguishable from the quitclaim date."

The court then summarized its findings, as follows: "The court, pursuant to its findings above, finds that the plaintiff has not paid the defendant alimony in the amount of $6226 of the $14,400 he was obligated to pay. The court does not find his actions wilful, however [it] enters remedial orders below.

"Regarding the bifurcated agreement/order on the real estate, the court finds that the orders were not clear and unambiguous, therefore the plaintiff's noncompliance with the court order was not wilful.

"Generally, an execution of orders to quitclaim property is subject to the party or parties who are obligated to the financial institution for paying the mortgage, disentangling their financial obligations, thus allowing for the party who quitclaims the property to no longer be held accountable as a [mortgagor]. Unless stated otherwise, in order to fully effectuate a quitclaim of property, the party who receives the quitclaim deed should have the capacity to independently assume the outstanding mortgage on the property. That party is subject to a lender qualifying them for said mortgage.

The plaintiff as a [mortgagor] made a convincing argument that his vested interest in preserving his credit was a defense that precluded his strict compliance with the deadline to quitclaim the property. He, however, continued to pay for household bills associated with the marital property for a protracted period of time.

"The court finds the plaintiff's testimony credible that the defendant was unable to meet the conditions for an independent mortgage. This is supported by the parties' actions when they refinanced the property in August of 2013, with them both signing the documents to execute the refinance. Additionally, there was no evidence or testimony to support the defendant's preparedness to independently assume the mortgage.

"The plaintiff continued to pay the primary household expenses such as the mortgage, real estate taxes, sewer, gas, and electric bills through 2019, two years post the ordered quitclaim date of February, 2017. While the defendant also paid some expenses towards the household bills prior to the property being quitclaimed to her, the court finds that the plaintiff significantly and substantially met his required obligations, over and above any limited payments that the defendant may have made. A quitclaim deed was executed on September 16, 2019 . . . and, according to testimony of the defendant, recorded on June 29, 2020. The date of the quitclaim is the recognized date of final execution of the pertinent court order.

"The defendant sold the property on June 8, 2021 . . . with all the net proceeds going to her in the amount of $125,561.

"The court finds that, in light of the parties' actions that modified the court orders, the significant payments of court-ordered expenses made by the plaintiff, the defendant's sale of the marital home in 2021 receiving net proceeds of $125,561, the court denies both the

defendant's motion for contempt and request for reimbursement therein." The court ordered the plaintiff to satisfy his outstanding alimony obligation by paying the defendant $6226 within forty-five days and denied the motion for contempt "as it relates to the real property and the quitclaim deed . . . and the request for any and all reimbursement . . . ."

The following legal principles and standard of review govern the defendant's claim that the plaintiff was in contempt of the orders entered pursuant to the judgment of dissolution when he failed to comply with his obligation to pay alimony and failed to quitclaim his interest in the marital home.

"Contempt is a disobedience to the rules and orders of a court which has power to punish for such an offense. . . . [C]ivil contempt is committed when a person violates an order of court which requires that person in specific and definite language to do or refrain from doing an act or series of acts. . . . In part because the contempt remedy is particularly harsh . . . such punishment should not rest upon implication or conjecture, [and] the language [of the court order] declaring . . . rights should be clear, or imposing burdens [should be] specific and unequivocal, so that the parties may not be misled thereby. . . .

"To constitute contempt, it is not enough that a party has merely violated a court order; the violation must be wilful. . . . It is the burden of the party seeking an order of contempt to prove, by clear and convincing evidence, both a clear and unambiguous directive to the alleged contemnor and the alleged contemnor's wilful noncompliance with that directive. . . . The question of whether the underlying order is clear and unambiguous is a legal inquiry subject to de novo review. . . . [I]f we conclude that the underlying court order was

sufficiently clear and unambiguous, we must then determine whether the trial court abused its discretion in issuing, or refusing to issue, a judgment of contempt, which includes a review of the trial court's determination of whether the violation was wilful or excused by a good faith dispute or misunderstanding. . . . Under the abuse of discretion standard of review, [w]e will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . [Thus, our] review of such rulings is limited to the questions of whether the trial court correctly applied the law and reasonably could have reached the conclusion that it did." (Citations omitted; internal quotation marks omitted.) *Trent* v. *Trent*, 226 Conn. App. 791, 797–98, 321 A.3d 454 (2024).

"We review the court's factual findings in the context of a motion for contempt to determine whether they are clearly erroneous. A factual finding is clearly erroneous when it is not supported by any evidence in the record or when there is evidence to support it, but the reviewing court is left with the definite and firm conviction that a mistake has been made." (Internal quotation marks omitted.) *Kirwan* v. *Kirwan*, 187 Conn. App. 375, 393–94, 202 A.3d 458 (2019).

A

Before we may consider the merits of the defendant's claim, in which she challenges the denial of her motion for contempt, it is necessary that we resolve a jurisdictional issue raised by the plaintiff in his appellate brief. Specifically, the plaintiff argues that the present claim is moot because, as of the time of this appeal, he has paid the defendant the $6226 alimony arrearage as ordered by the court and the marital home has been sold and he "no longer has any interest in it . . . ."

"Mootness implicates [this] court's subject matter jurisdiction and is thus a threshold matter for us to resolve. . . . It is a [well settled] general rule that the existence of an actual controversy is an essential requisite to appellate jurisdiction; it is not the province of appellate courts to decide moot questions, disconnected from the granting of actual relief or from the determination of which no practical relief can follow. . . . An actual controversy must exist not only at the time the appeal is taken, but also throughout the pendency of the appeal. . . . When, during the pendency of an appeal, events have occurred that preclude an appellate court from granting any practical relief through its disposition of the merits, a case has become moot. . . . [A] subject matter jurisdictional defect may not be waived . . . [or jurisdiction] conferred by the parties, explicitly or implicitly. . . . [T]he question of subject matter jurisdiction is a question of law . . . and, once raised, either by a party or by the court itself, the question must be answered before the court may decide the case." (Internal quotation marks omitted.) *Brookstone Homes*, *LLC* v. *Merco Holdings*, *LLC*, 208 Conn. App. 789, 798–99, 266 A.3d 921 (2021).

For several reasons, we are not persuaded that the payment of the alimony arrearage by the plaintiff and the sale of the marital home support the conclusion that there is no practical relief that we may afford the defendant in connection with this claim. First, we observe that the defendant argues in connection with this claim that she was entitled to *more* than the $6226 in alimony awarded to her by the court. In this regard, the defendant argues that, because the plaintiff did not make any monthly payments in the amount of $600 between February, 2013, and February, 2015, she was entitled to an award of all of the alimony that should have been paid to her, $14,400, plus an award of 10 percent in statutory interest on that amount of $15,100,

for a total award of $29,500. Second, with respect to the order requiring the plaintiff to quitclaim his interest in the marital home to her, the defendant argues that the court erroneously concluded that the plaintiff complied with this order on September 16, 2019, when he executed a quitclaim deed. The defendant argues that the plaintiff did not comply with his obligation to quitclaim his interest in the marital home until at least June 29, 2020, when the deed was recorded, and that the court failed to require him to pay for household expenses until that later date. Finally, in connection with her motion for contempt, the defendant sought, but was not awarded, attorney's fees. If this court were to grant her relief in connection with either subpart of this claim, the defendant may be able to recover not only an additional alimony payment or an additional payment for household expenses, but an award of attorney's fees.

For the foregoing reasons, we are not persuaded that this portion of the appeal should be dismissed on the ground that this court lacks subject matter jurisdiction over this claim. Having resolved the threshold jurisdictional issue raised by the plaintiff, we now reach the merits of the defendant's claim that the court abused its discretion in denying her motion for contempt.

B

With respect to the portion of the claim that pertains to alimony, the defendant argues that, despite the fact that, at the time of the dissolution judgment, the court ordered the plaintiff to pay her $600 per week in alimony between February, 2013, and February, 2015, the plaintiff failed to make any such alimony payments to her during that period of time. The defendant argues that it would be improper for the plaintiff to satisfy his alimony obligation by relying on amounts that he overpaid to meet household expenses because the order to pay alimony did not include an offset provision and

"[he] never filed a motion for modification and/or never otherwise informed the court or the defendant that he was intending to satisfy his alimony obligation by making overpayments of his household expense obligations. Significantly, per the judgment, neither the term of the two years nor the amount of $600 was modifiable. His alleged overpayments should arguably be considered gifts." The defendant, apparently acknowledging that the evidence supports a finding that the plaintiff made some alimony payments to her, in amounts less than $600 beginning in February, 2013, nonetheless argues that "[t]he plaintiff's unilateral decision to pay his alimony obligation in a manner of his choosing without the defendant's consent usurped her right to control the manner in which she would receive and allocate and/or spend her alimony funds." The defendant also argues that there was no evidence to suggest that the plaintiff lacked the ability to comply with his alimony obligation.

The defendant also argues that the court improperly found that the plaintiff had "labeled" some of the payments that he made to her as "alimony." According to the defendant, "[t]here is nothing in the exhibits that state that the payments were labeled as alimony payments. None of the columns [in these exhibits] even use the word alimony." Alternatively, the defendant argues that "[a]ny reference to alimony payments . . . [was] self-serving and the court abused its discretion in crediting the plaintiff with any such alimony payments." Finally, the defendant argues that, even if the court properly found that she and the plaintiff "were complicit in the manner in which they dealt with each other post-divorce, as evidenced by them agreeing to refinance the marital home in 2013, this is hardly a basis for crediting the plaintiff with over $8000 in alimony payments as [it] did."

First, we address the defendant's challenge to the court's finding that the plaintiff paid her $8174 in alimony and its finding that the plaintiff characterized any of the payments that he made to her as "alimony." In its memorandum of decision, the court referred to exhibits 1 and 6 introduced into evidence by the plaintiff. Exhibit 1 includes an itemized list, apparently created by the plaintiff, of "payments" made by him to the defendant's bank account, between February, 2013, and May, 2018, totaling $8174.84. The exhibit also includes a record of amounts paid by the plaintiff to the defendant for "water and sewer" and "real estate taxes." The plaintiff testified that exhibit 1 reflects payments that he made to the defendant. Exhibit 6 is titled "John Rettman Alimony Payments Transferred From His . . . Bank . . . Account . . . Directly To Maura Rettman's . . . Bank Account . . . ." Similar to the information contained in exhibit 1, exhibit 6, also generated by the plaintiff, contains an itemized list of payments made by him, totaling $8174.84, between February, 2013, and May, 2018. The plaintiff testified that exhibit 6 reflects alimony that he paid to the defendant. The plaintiff agreed with the court that these exhibits did not reflect $600 payments between the period of February, 2013, and February, 2015, but rather a series of multiple payments in lesser amounts that were made beginning in February, 2013, until May, 2018, totaling $8174.84. Exhibit 6 also contains the following notation: "Claimed alimony amount total is $14,400. Less the amount paid into [the defendant's] accounts of $8174.84 equals a balance of $6225.16. The plaintiff is now retired and living on a fixed income and cannot afford $600 a month or it will bankrupt him." This evidence, which the court expressly found to be credible, supports the court's reference to payments labeled by the plaintiff as "alimony" and its finding that the plaintiff had paid the defendant $8174 in alimony as of the time of the hearing

on the motion for contempt. Accordingly, the defendant has failed to demonstrate that the court's findings with respect to these matters were clearly erroneous.

Second, we address the defendant's contention that the court improperly found that the plaintiff's failure to pay her alimony in accordance with the court's 2013 clear and unambiguous alimony order was not wilful. Many of the defendant's arguments, however, overlook the reasoning in the court's memorandum of decision. The court found that the plaintiff did not make payments as were required by the court's order, resulting in a deficit in alimony payments of $6226. The court did not excuse the plaintiff's failure to make such payments on the ground that the plaintiff had overpaid household expenses, nor did the court find that the plaintiff was excused from paying his alimony obligation because he lacked the financial means to do so. Indeed, although the court denied the motion for contempt, it nonetheless entered a remedial order requiring the plaintiff to pay the defendant $6226.

In concluding that the plaintiff's failure to pay alimony was not wilful, the court relied on its finding, the correctness of which the defendant does not challenge in any meaningful way in this appeal, that from the time of the parties' dissolution, the parties had "practiced a financial arrangement that was complicit and blurred the lines between the court orders and compliance with those court orders." For example, the parties jointly refinanced the marital home in August, 2013, the parties consented to their family members living in the marital home at various times, and the plaintiff continued to pay household expenses into 2019, well past the time at which he was obligated to quitclaim his interest in the property to the defendant.[9]

---

[9] Although the court's findings with respect to the parties' mutual lack of strict compliance with the court's financial orders supports its conclusion that the plaintiff did not wilfully fail to comply with his alimony obligation, we emphasize that such a pattern of noncompliance by the parties is disfavored.

The defendant essentially urges us to conclude that, because the court's alimony order was clear and unambiguous and the plaintiff did not comply with it, the court necessarily erred in finding the noncompliance to not be wilful. This logic is faulty. "Motions for contempt implicate the court's inherent equitable authority to effectuate and vindicate its judgments." *Brody* v. *Brody*, 153 Conn. App. 625, 635, 103 A.3d 981, cert. denied, 315 Conn. 910, 105 A.3d 901 (2014). "Whether to find a party in contempt is ultimately a matter within the trial court's discretion." *Eldridge* v. *Eldridge*, 244 Conn. 523, 532, 710 A.2d 757 (1998). Simply because the plaintiff did not comply with the order, it did not necessarily mean, in light of the totality of the circumstances, that the court could not exercise its discretion and find that the plaintiff's conduct was not wilful. Instead, we conclude that the court reasonably declined to impose the harsh penalty of contempt in favor of requiring the plaintiff to pay the defendant an amount equaling the unpaid portion of his alimony obligation.[10]

## C

We next address the portion of the defendant's claim that relates to the plaintiff's obligation to quitclaim his

"[T]his court and our Supreme Court previously have determined that a party's decision to use self-help instead of judicial resources to modify an obligation under a judgment in a family matter could be a basis for granting a motion for contempt against that party . . . ." (Internal quotation marks omitted.) *Lynch* v. *Lynch*, 153 Conn. App. 208, 240, 100 A.3d 968 (2014), cert. denied, 315 Conn. 923, 108 A.3d 1124, cert. denied, 577 U.S. 839, 136 S. Ct. 68, 193 L. Ed. 2d 66 (2015). "A party to a court proceeding must obey the court's orders unless and until they are modified or rescinded, and may not engage in 'self-help' by disobeying a court order to achieve the party's desired end." *O'Brien* v. *O'Brien*, 326 Conn. 81, 97, 161 A.3d 1236 (2017). If the plaintiff was unsure of what the court's order required of him, it was incumbent upon him to seek clarification from the court.

[10] In light of our conclusion that the court did not abuse its discretion in finding that the plaintiff did not wilfully violate the alimony order in light of the parties' conduct following the entry of the financial orders, we are not persuaded by the defendant's claim that the court's remedial order did not sufficiently compensate her for the plaintiff's failure to pay all of his alimony obligation in a timely manner.

interest in the marital home to the defendant.[11] The defendant argues that the court improperly denied her motion for contempt on the ground that the plaintiff failed to quitclaim his interest in the marital home to her by February 5, 2017, an obligation that, in her view, is clearly and unambiguously set forth in the court's financial orders. The defendant argues that the court erroneously concluded that the effective date of the plaintiff's transfer of his interest in the marital home to her occurred on September 16, 2019, the undisputed date on which he signed the quitclaim deed. According to the defendant, on that date the quitclaim deed had neither been delivered to her nor accepted by her. The defendant argues that "the earliest effective date" of the transfer of the plaintiff's interest in the home was on June 29, 2020, the undisputed date on which he recorded the deed on the land records. Alternatively, the defendant argues that the transfer of the marital home to her by way of the quitclaim deed "was never actually effective" because she did not accept the terms set forth in the deed, some of which required her to release the plaintiff from any financial obligations related to the marital home, and she filed an objection to the deed after she was in possession of it.

The defendant argues that the court improperly agreed with the plaintiff's argument that he was not required to transfer his interest in the marital home until such time as the defendant was in a financial position to refinance it, thereby removing the plaintiff's name from the mortgage on the home. The defendant asserts that, even if the plaintiff acted under a good faith belief, his failure to comply with the court's order did not preclude a finding of contempt. The defendant posits that she was prejudiced because "[t]he plaintiff,

---

[11] A quitclaim deed is "an ordinary and primary instrument of conveyance and conveys to the grantee whatever interest the grantor has in the property." *Hoyt* v. *Ketcham*, 54 Conn. 60, 62, 5 A. 606 (1886).

by refusing to quitclaim the deed to [her] until she was financially able to refinance the home essentially usurped her ability to put the home up for sale which, when sold, would have removed the plaintiff's name from the mortgage." Moreover, the defendant argues that, by failing to find the plaintiff in contempt, the court erroneously "modified and/or augmented the [parties' dissolution] agreement when it essentially decided that the agreement meant to say that the plaintiff did not have to quitclaim the marital property to the defendant until she was in a financial position to refinance it."

In denying the motion for contempt, the court concluded that the order with respect to the plaintiff's obligation to quitclaim his interest in the marital home to the defendant was not clear and unambiguous because it did not specify whether compliance with the order occurred upon execution of the deed, the recording of the deed, or some other occurrence. Thus, the court determined that, for purposes of determining whether the plaintiff was in contempt of the dissolution order, the date on which the plaintiff executed the deed was "not significantly distinguishable" from the date on which it had been recorded on the land records. Having also found that "the defendant was unable to meet the conditions for an independent mortgage," the court was persuaded by the plaintiff's argument that his failure to act with respect to the quitclaim deed within four years was the result of the defendant's inability to assume sole responsibility of the mortgage on the marital home, and, therefore, was not wilful. The court determined that the plaintiff, who at the time of the dissolution judgment was a mortgagor of the marital home together with the defendant, had made "a convincing argument that his vested interest in preserving his credit was a defense that precluded his strict compliance with the deadline to quitclaim the property."

As stated previously, we review de novo the court's legal determination that the order at issue was not clear and unambiguous. See *Trent* v. *Trent*, supra, 226 Conn. App. 797. "As a general rule, judgments are to be construed in the same fashion as other written instruments. . . . The determinative factor is the intention of the court as gathered from all parts of the judgment. . . . The interpretation of a judgment may involve the circumstances surrounding the making of the judgment. . . . Effect must be given to that which is clearly implied as well as to that which is expressed. . . . The judgment should admit of a consistent construction as a whole." (Internal quotation marks omitted.) *Perry* v. *Perry*, 156 Conn. App. 587, 593, 113 A.3d 132, cert. denied, 317 Conn. 906, 114 A.3d 1220 (2015). "The language of a judgment must be given its ordinary meaning unless a technical or special meaning is clearly intended." *Brewer* v. *Gutierrez*, 42 Conn. App. 421, 424, 681 A.2d 345 (1996).

The order, dated February 5, 2013, stated that "the plaintiff shall quitclaim [the marital home] to the defendant. The defendant shall be responsible for all household bills from the date of the [quitclaim] deed." The dissolution court also ordered that the marital home "will remain joint property of the plaintiff and the defendant for four years." We reach the same conclusion as Judge Price-Boreland, that the order at issue is unclear and ambiguous. The order reasonably could be interpreted to mean that the plaintiff and the defendant were required to continue to jointly own the marital home for at least four years following the date of the dissolution judgment. Under such a construction of the order, it would have been improper for the plaintiff to have quitclaimed his interest in the marital home prior to February 5, 2017, and there is no readily identifiable deadline for the plaintiff to take any action with respect to a quitclaim deed by any particular date thereafter.

Moreover, the orders do not specify what specific conduct constitutes compliance with the order beyond the requirement that the plaintiff "quitclaim" the marital home to the defendant. The ambiguity that arises from the court's use of the colloquial phrase "quitclaim" is readily reflected in the parties' arguments before this court. The plaintiff believes that compliance occurred upon his execution of the quitclaim deed. The defendant argues that compliance with the order occurred, at the earliest, once the quitclaim deed had been recorded and, in the alternative, that the plaintiff could not have complied with the order until the quitclaim deed was both delivered to her and accepted by her.[12]

Our conclusion that the order was not clear and unambiguous is a sufficient basis on which to uphold the court's denial of the motion for contempt to the extent that it is based on the plaintiff's alleged failure to quitclaim the marital home to the defendant in a timely manner. We also note that, in determining that a wilful violation of a court order did not occur, the court credited the evidence that the defendant was unable to meet the conditions of an independent mortgage, as well as the plaintiff's testimony that his alleged noncompliance was the result of his own interest in protecting his credit. These additional findings further support the court's finding that the plaintiff did not wilfully fail to comply with his obligation to quitclaim his interest in a timely manner. It was proper for the court to consider the plaintiff's rationale for his alleged noncompliance and exercise its discretion to deny the motion for contempt, particularly in light of the unclear

---

[12] In light of our conclusion that the order was not clear and unambiguous, we are not persuaded by the defendant's argument that the court improperly failed to require the plaintiff to pay household expenses until June 29, 2020, the date on which the plaintiff recorded the quitclaim deed, rather than September 16, 2019, the date on which the plaintiff executed the quitclaim deed.

and ambiguous order at issue. Contrary to the defendant's arguments, the court, in denying the motion for contempt, did not in any way augment or modify the terms of the dissolution judgment. Instead, the court merely declined to find the plaintiff in contempt for failing to comply with an order that the court found to be unclear and ambiguous. We are not persuaded that the ruling reflects an abuse of the trial court's discretion.

The judgment denying the motion to open the judgment denying the motions to open the dissolution judgment is reversed, the judgment denying the motions to open the dissolution judgment is vacated, and the case is remanded for further proceedings on the defendant's motions to open the dissolution judgment; the judgment denying the defendant's motion for contempt is affirmed.

In this opinion the other judges concurred.